UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------X

MODARAMO MEDIA, INC.,

Plaintiff,

-against-

SURYAMEET SINGH; EMIR MUSIC; GUMBALL DIGITAL, LLC; ABC CORPORATIONS 1-5 (fictitiously named business entities); and JOHN DOES 1-5 (fictitiously named individuals),

Defendants.

----------------------------------------------------------X

ORDER
25-CV-6570 (JS)(ST)

APPEARANCES

For Plaintiff
Modaramo Media: Mark A. Saloman, Esq.
Seth Spiegal, Esq.
Ford & Harrison LLP
300 Connell Drive, Suite 4100
Berkeley Heights, New Jersey 07922

For Defendants
Suryameet Singh &
Gumball Digital,
LLC: Robert Hawkins, Esq.
Paykin Law
99 Tulip Avenue, Suite 408
Floral Park, New York 11001

For Defendant Emir
Music: Vincent Miletti, Esq.
Miletti Law, P.C.
153 West End Avenue, Suite 2A
Brooklyn, New York 11235

SEYBERT, District Judge:

Presently before the Court are the Motions to Dismiss the operative complaint[1] of Plaintiff Modaramo Media, Inc. ("Plaintiff" or "Modaramo") filed by moving Defendants Suryameet Singh ("Singh"), Gumball Digital, LLC ("Gumball", and, collectively with Singh, the "Singh Defendants"), and Emir Music ("Music", and, collectively with the Singh Defendants, "Defendants"). (See Singh Motion, ECF No. 24; Music Motion, ECF No. 24-1; Singh Reply, ECF No. 24-3; Music Reply, ECF No. 24-4.) Plaintiff opposes the Motions. (See Opp'n, ECF No. 24-2.) For the reasons provided below, Defendants' Motions are GRANTED in part and DENIED in part.

# I. Factual Background

## A. The Parties

### 1. Modaramo

#### a. The Company, Generally

Plaintiff is a data-driven marketing company that deploys "proprietary artificial intelligence and optimization systems" to "connec[t] consumers looking for services with companies that provide those services online." (FAC ¶¶ 20-21.) Plaintiff alleges, through years of work and substantial investment, it "built proprietary tools and confidential datasets[,] including pricing algorithms, campaign optimization

---

[1] The operative complaint is the Amended Complaint (ECF No. 13) which, herein, the Court refers to as the "First Amended Complaint" or "FAC."

models, lead-generation engines, client and publisher databases, payout methodologies, and integration credentials for partner platforms" used in its business to connect consumers and service providers. (Id. ¶ 23.) These "proprietary tools" are used in several platforms Plaintiff regularly uses in its business.

b. **AdPrecise and BRM**

The FAC primarily focuses on two of Plaintiff's most important products: its "Agency Model" ("AdPrecise") and "Principal Model" ("BrightReach Media" or "BRM"). (Id. ¶ 28.) Per Plaintiff, both models came out of "over more than a decade of sustained investment, experimentation, and refinement." (Id. ¶ 35.)

AdPrecise functions as a "proprietary exchange architecture" through which advertisers and publishers transact through Plaintiff's "controlled environment, where confidential algorithms dynamically determine pricing, traffic allocation, publisher eligibility, fraud thresholds, and compliance gating in real time." (Id. ¶¶ 29–30.) For BRM, "Modaramo acts as a principal" and "contracts directly with advertisers and publishers to purchase or control media placements and sell traffic or leads." (Id. ¶ 31.) Likewise, BRM "is dependent on" Plaintiff's non-public datasets and "is dependent on confidential historical performance data, margin analytics, advertiser-specific pricing floors,

conversion probability modeling, and campaign structuring methodologies developed through years of trial and error." (Id. ¶ 32.)

Plaintiff alleges it undertakes various measures to protect trade secrets and confidential information related to AdPrecise and BRM, including: limiting internal access to "BRM pricing analytics, margin data, and campaign performance systems" to a small subset of senior personnel; barring AdPrecise personnel from accessing BRM data without explicit approval; "unique login credentials, role-based permissions, access logging, IP monitoring, audit trails, and periodic internal audits designed to detect unauthorized access or misuse"; prohibiting third-party access to its internal systems; and, providing third parties only "summarized outputs" of data subject to the third party contractually agreeing not to reverse engineer Plaintiff's programs. (Id. ¶¶ 39-47.)

2. **Singh**

Plaintiff employed Singh from March 2014 until March 2023. (Id. ¶ 52.) During his employment with Plaintiff, Singh "held senior-level positions, including as BRM's Director of Strategic Partnerships, in which he oversaw campaign execution, client acquisition, and pricing structures." (Id. ¶¶ 52-53.) While he was Director of Strategic Partnerships, Singh had access to

BRM's confidential information, including "client lists, advertiser contracts, internal analytics, and performance-based revenue models." (Id. ¶ 54.)

The FAC alleges, as a condition of his employment, "Singh signed both an offer letter ('Singh Offer Letter') and an Employee Nondisclosure and Assignment Agreement ('Singh NDA')." (Id. ¶ 55.) Under the Singh Offer Letter, Singh agreed to not disclose, during or after his employment, "proprietary and confidential information" related to Plaintiff's business, and agreed to execute any further confidentiality, non-solicitation, or non-competition agreements Plaintiff might require.[2] (Id. ¶ 56.) Under the Singh NDA, Singh agreed not to disclose "Trade Secrets or Confidential Information" of Plaintiff or its clients, as defined in the Singh NDA, without Plaintiff's consent.[3]

---

[2] The FAC states Singh had "one-year post-employment periods referenced under Paragraphs 8(b), 8(c), and 8(e) of the Singh Offer Letter and Paragraphs 1 and 5 of the Singh NDA," but does not quote these provisions. (FAC ¶ 77.)

[3] The Singh NDA defines "Trade Secrets" as:

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a design, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information: (a) derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable

(Id. ¶ 57.) The Singh NDA imposed no temporal limit on Singh's obligations with respect to Trade Secrets, while his obligations concerning Confidential Information expired five years after termination of his employment. (Id.)

In October 2023, Singh joined Diablo Media, Inc. ("Diablo"), an advertising client of Plaintiff. (Id. ¶ 70.) In or about January 2024, Singh co-founded Gumball with Diablo's CEO, Ben Smith, and became Gumball's CEO. (Id. ¶ 72.)

3. **Gumball**

Plaintiff alleges Gumball, one of its direct competitors, offers "performance marketing services across the legal, debt, and financial verticals." (Id. ¶ 74.) Within months of its founding, Gumball's business model purportedly "replicated Modaramo's operational framework, including pricing structures, campaign configuration, publisher payout methodologies, and advertiser onboarding strategies, in a manner that could not have occurred without access to Modaramo's confidential information." (Id. ¶ 75.)

---

> by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

(FAC ¶ 57.) The Singh NDA defines "Confidential Information" as "any confidential or proprietary information that does not constitute a Trade Secret as defined above." (Id.)

4. **Music**

Music worked for Plaintiff from August 2020 until his termination on September 18, 2025. (Id. ¶ 58.) During his employment, Music served as Director of Growth & Partnerships for AdPrecise, where he managed publisher and advertiser relationships and coordinated client marketing campaigns within AdPrecise. (Id. ¶¶ 59-60.) According to the FAC, Music's role did not "require or permit him to oversee or access Modaramo's core BRM operations" or information. (Id. ¶ 61.) Nevertheless, Plaintiff gave Music access to certain internal systems, including an analytics platform known as TUNE, to facilitate internal coordination.[4] (Id. ¶ 66.) Music also signed an offer letter (the "Music Offer Letter") and a confidentiality and non-disclosure agreement (the "Music NDA"), which contained identical confidentiality provisions to those contained in the Singh Offer Letter and NDA. (Id. ¶¶ 62, 64-65.) In addition, the Music Offer Letter required Music to

[4] In the FAC, TUNE is described as "a cloud-based performance marketing and analytics platform used to manage advertising campaigns, track conversions, monitor traffic sources, generate performance reports, and store detailed advertiser and publisher data, containing confidential information such as pricing structures, payout data, client performance metrics, and system access keys." (Id. ¶ 24.)

devote his "full time, attention, energy, knowledge, best professional efforts and skills" to Plaintiff. (Id. ¶ 63.)

## B. **Allegations of Unauthorized Access and Disclosure of Confidential Information**

### 1. **The Singh IP Address Information**

On January 27, 2025, Plaintiff recorded a TUNE login using Music's Modaramo credentials. (Id. ¶ 78.) From April to September 2025, Plaintiff's systems recorded several logins with Music's Modaramo credentials coming from a Singh-affiliated personal Gmail account and IP address, at a location consistent with Singh's Bethpage, New York residence. (Id. ¶ 79.) The FAC alleges these logins accessed "BRM reports, pricing analytics, and client communications," though Music lacked "the business need or technical training to access BRM's data, which was tightly restricted to authorized BRM personnel." (Id. ¶¶ 82-83.) Singh, however, did receive BRM data training while at Modaramo. (Id. ¶ 83.)

### 2. **Singh & Music Meet with Plaintiff's Client**

In August 2025, Music allegedly invited Singh "to participate in at least one Modaramo client meeting" with an unnamed client (the "Unnamed Client"). (Id. ¶ 104.) At the client meeting, per the FAC, Music instructed the Unnamed Client "to refrain from mentioning that Singh was present" and, during the meeting, discussed "client-specific pricing structures, margin

expectations, campaign economics, and strategic considerations that governed Modaramo's relationship with the client." (Id. ¶¶ 106-07.) Plaintiff alleges, after the meeting, the Unnamed Client "terminated or materially reduced its business relationship with Modaramo and, upon information and belief, transferred its business to Gumball." (Id. ¶ 109.)

Music's allegedly suspicious activity within Modaramo hit a breaking point on September 15, 2025, when he "tried to dissuade Modaramo's Chief Executive Officer from attending the eCommerce Founders Conference in New York", purportedly because Music planned to collaborate with Singh at the conference. (Id. ¶¶ 84-85.) As alleged in the FAC, this incident prompted Plaintiff to investigate Music's activities, beginning with an audit of his company computer and login records the following day. (Id. ¶¶ 86-87.) According to the FAC, the audit revealed "Music's credentials had been used to perform approximately 170 unauthorized activities", including "activity beyond Music's authorization and scope of duties", such as accessing restricted, BRM-related data without a business need to do so. (Id. ¶¶ 88-94.) The audit also indicated Music had accessed very granular data, which suggested "a deliberate effort to disclose that highly useful material to a competitor such as Singh and Gumball," as Singh would have been familiar with this kind of data from his time at

Modaramo. (Id. ¶ 92.) On September 18, 2025, Plaintiff terminated Music's employment. (Id. ¶ 94.)

Per the FAC, additional evidence of Music's misconduct was uncovered in Plaintiff's subsequent post-termination investigations. (Id. ¶ 95.) The investigation uncovered a Chrome profile containing Singh-associated information, searches concerning how to download Slack messages, and use of Singh's "personal credentials." (Id.) Separately, on September 26, 2025, Plaintiff allegedly discovered IRS Forms 1099 indicating Music had diverted certain "Everflow[5] referral payments" totaling more than $30,000 to his personal account, even though the payments belonged to Plaintiff. (Id. ¶¶ 96-98.) Plaintiff also asserts Music worked "on an outside venture called TaxMagnet during normal business hours" during his Modaramo employment, although the FAC provides few factual allegations concerning the scope or nature of the TaxMagnet work. (Id. ¶ 99.)

### 3. **Gumball's Alleged Receipt and Use of Trade Secret Information**

Plaintiff alleges Defendants' use of Plaintiff's confidential information enabled Gumball to replicate Plaintiff's

[5] The FAC describes Everflow as "an affiliate management platform, which serves as a central repository of confidential and proprietary information, such as operational data, client intelligence, and business analytics." (Id. ¶ 24.)

pricing structures, campaign strategies, client-outreach methods, and other aspects of its business, thereby allowing Gumball to compete directly for Modaramo's clients. (Id. ¶¶ 74-77; 101-02; 117-121.) Plaintiff further asserts the Unnamed Client's departure to Gumball resulted in $180,000 in lost revenue. (Id. ¶ 110.) More generally, Plaintiff contends Defendants' conduct caused "monetary loss, diversion of existing and prospective client relationships, loss of competitive advantage, reputational injury, erosion of goodwill, and other damages." (Id. ¶ 112.)

## II. **The FAC, Motion, and Opposition**

### A. **FAC**

On November 25, 2025, Plaintiff filed the initial complaint, and on January 16, 2026, Plaintiff filed the FAC.[6] (See Compl., ECF No. 1; FAC.) The FAC principally alleges Defendants misappropriated Plaintiff's trade secrets, such as "proprietary tools and confidential datasets including pricing algorithms, campaign optimization models, lead-generation engines, client and publisher databases, payout methodologies, and integration credentials for partner platforms", in violation of the Defend Trade Secrets Act (the "DTSA Claim"). (FAC ¶¶ 113–22.) According to the FAC, these purported trade secrets are essential to AdPrecise and BRM, which depend "on the unique aggregation,

---

[6] The FAC also asserts claims against fictitiously-named ABC Corporations 1-5 and John Does 1-5. This Opinion does not address any claim against such entities should they be identified.

integration, and application of its proprietary tools, confidential datasets, algorithms, pricing methodologies, and operational workflows." (Id. ¶ 36.) Plaintiff also asserts New York state law claims for misappropriation of confidential information against all Defendants (the "State Law Misappropriation Claim"); breach of contract against Singh and Music[7], based principally on their alleged non-disclosure obligations under their respective Offer Letters and NDA's (respectively, the "Singh Breach of Contract Claim" and "Music Breach of Contract Claim"); and conversion[8] against all Defendants based largely upon the misappropriation of Plaintiff's trade secrets (the "Conversion Claim"). (Id. ¶¶ 128-47, 178-87.)

In addition to the aforementioned claims, Plaintiff asserts seven further causes of action: (1) a Computer Fraud and Abuse Act (the "CFAA") claim against the Singh Defendants, based on Singh's alleged use of Music's credentials (the "CFAA Claim"); (2) a faithless servant claim against Music (the "Faithless Servant Claim") and (3) aiding and abetting breach of fiduciary duty claim

---

[7] The Music Breach of Contract Claim also alleges Music's work with TaxMagnet and his diversion of the Everflow payments breached his contractual obligations to devote his full time and attention to Plaintiff. (Id. ¶¶ 143-44.)

[8] In addition to asserting conversion claims related to misappropriation of trade secrets, Plaintiff also maintains Music engaged in conversion by "diverting to his personal account Everflow referral payments belonging to Modaramo." (FAC ¶ 152.)

against the Singh Defendants (the "Aiding and Abetting Claim"), for Music's alleged breaches of his fiduciary duties to Plaintiff and the Singh Defendants' alleged participation in the same; (4) a tortious interference with contract claim against the Singh Defendants, based upon purported interference with Music's employment contracts (the "Tortious Interference with Contract Claim"); (5) tortious interference with prospective economic relations claims against the Singh Defendants (the "Tortious Interference with Clients Claim"); (6) a usurpation of corporate opportunity claim against Music, based upon his supposed Everflow payment diversion (the "Usurpation Claim"); and (7) a broad unjust enrichment claim against all Defendants (the "Unjust Enrichment Claim"). (Id. ¶¶ 123-27, 155-77, 188-98.)

B. **Motions to Dismiss and Opposition**

On February 11, 2026, Music served his Motion and, on March 9, 2026, the Singh Defendants served their Motion.[9] (See Music Motion; Singh Motion, collectively, the "Motions".) Both Motions argue the FAC's alleged trade secrets—namely, "pricing algorithms", "campaign optimization models", and "lead-generation

---

[9] The Music Motion did not comply with this Court's page limitation requirement for motions to dismiss. (See Seybert Individual Rule III (E)(1) ("[u]nless prior permission has been granted, memoranda of law in support of and in opposition to motions are limited to twenty-five (25) pages, and reply memoranda are limited to ten (10) pages")). Notwithstanding the noncompliance, the Court exercises its discretion to review the Motion.

engines"—lack the specificity required for trade-secret protection. (Singh Motion at 3 (quoting FAC ¶ 23); Music Motion at 9-10 (quoting FAC ¶ 23).) Singh and Music additionally contend no facts plausibly allege misappropriation by improper means, since: (1) Music's access to Modaramo's systems was expressly authorized; and (2) the FAC purportedly fails to connect any particular trade secret to any particular act of misappropriation. (Singh Motion at 8; Music Motion at 10-12.) The Motions also advance arguments in support of dismissing Plaintiff's remaining claims, which the Court addresses below. (See generally Singh Motion; Music Motion.)

In addition to these legal arguments, the Motions rely upon factual assertions contained in affidavits submitted by Singh and Music. (See generally Singh Motion (citing Singh Aff., ECF No. 24 at pp. 31-34, attached to Singh Motion); Music Motion (citing Music Aff., ECF No. 24-1 at pp. 59-79, attached to Music Motion).) These affidavits appear to be introduced to contest the FAC's allegations regarding the underlying events. (Id.) For the reasons discussed below, the Court does not consider these affidavits or other attached materials at the motion to dismiss stage.

On April 13, 2026, Plaintiff served its Opposition, defending the sufficiency of its trade-secret allegations and

contesting Defendants' remaining arguments. (See generally Opp'n.) On May 15, 2026, Defendants filed their respective replies.[10] (See generally Singh Reply; Music Reply.)

## DISCUSSION

### I. Applicable Law

A claim is properly dismissed pursuant to Rule 12(b)(6) where it "fail[s] to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In determining whether to grant a Rule 12(b)(6) motion, courts must "accept as true the factual allegations contained in the complaint and draw all inferences in plaintiff's favor." Glob. Network Commc'ns, Inc. v. City of N.Y., 458 F.3d 150, 154 (2d Cir. 2006). To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Basile v. Levittown United Tchrs., 17 F. Supp. 3d 195, 200 (E.D.N.Y. 2014) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). However, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief'

[10] Neither Singh's nor Music's Reply complied with this Court's page limitation requirements. See Seybert Individual Rule III (E)(1). Although the Court exercises its discretion to consider these materials, best practice is to assure compliance with all local and individual rules.

requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do[.]" Twombly, 550 U.S. at 555 (internal citations omitted).

## II. **Whether the Affidavits Can Be Considered**

"With the limited exception of documents incorporated by reference[], the Court ordinarily does not consider matters outside of the pleadings in resolving a motion to dismiss, which includes 'new factual allegations in memoranda, affidavits, declarations, and sur-replies.'" Mitchell v. N.Y.C. Dep't of Educ., No. 20-CV-1555, 2021 WL 8013770, at *8 (S.D.N.Y. May 7, 2021), report and recommendation adopted, 2022 WL 621956 (S.D.N.Y. Mar. 3, 2022). Despite this rule, many of Defendants' arguments rely upon factual disputes raised in their affidavits. Discovery may ultimately support Singh's and Music's account of the underlying events, but at this stage, the Court is "constrained to accept as true the factual allegations contained in the complaint." Glob. Network Commc'ns, Inc., 458 F.3d at 154. Accordingly, the Court does not consider either the Singh or Music Affidavits, or any arguments that rely upon them.

## III. **Application**

### A. **The DTSA & Related Claims**

#### 1. **The DTSA Claim**

"To state a claim for trade secret misappropriation under the DTSA, a plaintiff must plausibly allege that (1) it

possessed a trade secret, and (2) the defendant misappropriated the trade secret." Medidata Sols., Inc., v. Veeva Sys. Inc., No. 17-CV-589, 2018 WL 6173349, at *3 (S.D.N.Y. Nov. 26, 2018). "To establish the existence of a trade secret, a plaintiff must demonstrate, as a threshold matter, that the property in question is comprised of 'financial, business, scientific, technical, economic, or engineering information' including 'formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes.'" Turret Labs USA, Inc. v. CargoSprint, LLC, No. 19-CV-6793, 2021 WL 535217, at *4 (E.D.N.Y. Feb. 12, 2021) (quoting 18 U.S.C. § 1839(3)), aff'd, No. 21-952, 2022 WL 701161 (2d Cir. Mar. 9, 2022). Provided this threshold subject-matter requirement is met, the plaintiff must additionally show it took "reasonable measures to keep such information secret" and that the subject matter derives "independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(A)-(B).

After these qualities are shown to exist, a DTSA claim then requires showing misappropriation through:

> an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of

> disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.

Elsevier Inc. v. Dr. Evidence, LLC, No. 17-CV-5540, 2018 WL 557906, at *3 (S.D.N.Y. Jan. 23, 2018) (quoting In re Document Techs. Litig., No. 17-CV-2405, 2017 WL 2895945, at *5 (S.D.N.Y. July 6, 2017)).

a. **Whether Trade Secret Subject Matter Exists**

Defendants argue the subject matter identified in the FAC—including "pricing algorithms", "campaign optimization models", and "lead-generation engines"—used for AdPrecise and BRM, is too broad and generic to qualify for trade-secret protection. (Singh Motion at 3 (quoting FAC ¶ 23); Music Motion at 9–10 (quoting FAC ¶ 23).) The Singh Defendants rely upon Elsevier Incorporated v. Doctor Evidence, LLC, where a Southern District court dismissed a DTSA claim based upon, inter alia, "clinical methods," a "process to assess the quality of evidence and how to execute it," and "interpretation of data." 2018 WL 557906, at *5-6. There, the court found those allegations insufficient because the claimant did not explain how the methods and processes functioned within the relevant products and services or provide details concerning their value or secrecy. Id. The Singh Defendants also rely on Turret Labs USA, Incorporated v. Cargo

Sprint LLC, where an Eastern District court rejected a trade-secret claim related to a software program's functionality. 2021 WL 535217, at *4. The issue in Turret Labs became whether the owners properly safeguarded the confidentiality of that functionality. Id. Counsel for the Singh Defendants further contends Core SWX, LLC v. Vitec Group United States Holdings is "[t]he most directly on-point EDNY decision." (Hawkins Aff., ECF No. 24-3, at ECF pp. 1-6, attached to Singh Reply (citing No. 21-CV-1697, 2022 WL 3588081, at *7 (E.D.N.Y. July 14, 2022), report and recommendation adopted, 2022 WL 3586570 (E.D.N.Y. Aug. 22, 2022)).) There, the court found insufficient allegations identifying "proprietary product designs and marketing development information" without tying those categories to a specific algorithm, product component, or document related to two general battery products. Id. Likewise, Music draws a parallel between the FAC and the allegations in Sapir v. Rosen, where the Southern District court found insufficient allegations identifying a lengthy list of business documents that "might" constitute trade secrets. No. 20-CV-6191, 2021 WL 4482277, at *5 (S.D.N.Y. Sept. 30, 2021).

In Opposition, Plaintiff observes there is no heightened pleading standard for trade secrets, which need only be pleaded with sufficient specificity "to inform the defendants of what they are alleged to have misappropriated." (Opp'n at 6-7 (quoting Iacovacci v. Brevet Holdings, Ltd., Liab. Co., 437 F. Supp. 3d

367, 380 (S.D.N.Y. 2020)).) Plaintiff contends it has sufficiently identified the information Defendants misappropriated, citing several cases in which similarly-described alleged trade secrets survived motions to dismiss. (Opp'n at 6-9 (citing, e.g., Iacovacci, 437 F. Supp. 3d at 380–81 (non-public client-sourcing information, "business-specific non-disclosure agreements", and other specifically-identified documents were protectable); Recovery Racing III, LLC v. Brown, No. 20-CV-4696, 2021 WL 9678666, at *8 (E.D.N.Y. Oct. 28, 2021) ("details of operations, sales, pricing, agreements, inventory, employee information, supplier information, repair information and customer information and lists" related to car dealership business operations were protectable); Kraus USA, Inc. v. Magarik, No. 17-CV-6541, 2020 WL 2415670, at *1 (S.D.N.Y. May 12, 2020) ("technical product specifications, information on upcoming designs, sales data, e-commerce data, and other commercially sensitive information including customer lists, vendor relationships, the identity of contractual counterparties, internal cost structure and operating expenses, and e-commerce knowledge" related to online lighting business were protectable).)

Plaintiff's asserted trade secrets—"pricing algorithms, campaign optimization models, lead-generation engines, client and publisher databases, payout methodologies, and integration credentials for partner platforms" related to AdPrecise and BRM—

are sufficiently specific to put Defendants on notice "of what they are alleged to have misappropriated." (FAC ¶ 114); Iacovacci, 437 F. Supp. 3d at 380. The FAC resembles the pleadings sustained in Iacovacci, Recovery Racing, and Kraus USA, where courts found similarly-described non-public client and sourcing information, data, and technical product specifications protectable because the plaintiffs tied those categories to particular products, systems, or business operations and explained their role within them. Iacovacci, 437 F. Supp. 3d at 380-81; Recovery Racing III, 2021 WL 9678666, at *8; Kraus USA, 2020 WL 2415670, at *1. Similarly, the FAC alleges AdPrecise's pricing, traffic-allocation, publisher eligibility, and fraud-threshold determinations rely upon confidential, non-public datasets that are stored in identified internal platforms and restricted to limited personnel, as are BRM's historical performance data, margin analytics, pricing floors, conversion probability modeling, and campaign structuring methodologies. (FAC ¶¶ 24, 29-30, 32, 34.)

Unlike the Elsevier claimant's failure to identify "the information's value, the extent to which it is known by those within and outside the business, the amount of effort or money spent to develop the information, and the ease with which the information could be acquired or developed by outsiders", here, the FAC clearly demonstrates how Plaintiff's confidential datasets and other protectable subject matter drive AdPrecise and BRM. 2018

WL 557906, at *6. Such specificity is also far greater than the user-facing software functionality alleged in Turret Labs or the list of categories the Sapir plaintiff said "might" be trade secrets. 2021 WL 535217, at *4; 2021 WL 4482277, at *5.

Similarly, the Court disagrees that Core SWX is "most relevant to this case", as the Core SWX plaintiff made only general assertions about "'product design' or 'marketing information' related to" entire battery products because "[n]o specific document within the product design information or marketing information [was] mentioned, nor were these general categories tied to a specific aspect of" the battery products.[11] 2022 WL 3588081, at *7. Here, by contrast, the FAC explains how specific aspects of AdPrecise and BRM use the supposed trade-secret information.[12] (See FAC ¶¶ 28-37.) Thus, Plaintiff has adequately pleaded trade-secret subject matter.

---

[11] In Reply, the Singh Defendants fault Plaintiff for relying upon authorities from the Southern District of New York, which it contends carry "no precedential weight" when compared to authorities from the Eastern District of New York. (Singh Reply at 3-4.) The Court is unpersuaded, since courts from the Eastern District of New York regularly rely upon and cite to authorities from the Southern District of New York, especially when assessing similar issues. See United States v. Walden, No. 24-CR-0521, 2025 WL 3154359, at *8 (E.D.N.Y. Nov. 12, 2025) (further citation omitted).

[12] The Opposition also identifies several categories of trade secrets not mentioned in the FAC, such as "Landing Page Application", "offer configurations and targeting parameters", "third-party network offer mappings and associated tracking

b. **Whether Secrecy Requirements are Met**

Defendants contend the FAC "pleads secrecy measures in broad strokes" without identifying the required "reasonable measures" Plaintiff took to protect its trade secrets. (Singh Motion at 1, 6 (citing Turret Labs, 2021 WL 535217, at *4-6); Music Motion at 10-11 (citing Sapir, 2021 WL 4482277, at *6).) Music goes further in his Reply, contending the FAC undermines its own secrecy allegations by pleading that Music was given internal access to BRM systems supposedly outside of his ambit. (Reply at 11 (citing FAC ¶¶ 58-68)); see also Medidata Sols., 2018 WL 6173349 at *3-4 (stating "reasonable steps to protect trade secrets" include NDA's with "customers, partners, vendors and employees" and restricting access "to information to those with a need to know by using passwords and, for some applications, two-factor authentication"); Mtivity, Inc. v. Office Depot, Inc., 525 F. Supp. 3d 433, 446 (E.D.N.Y. 2021) (finding security measures met where NDA "contains a lengthy confidentiality clause explicitly designed to survive termination").)

parameters", "proprietary user qualification and lead routing logic", "conversion tracking data", and "authorized personnel activity logs." (Opp'n at 7.) As Plaintiff cannot amend its complaint in an opposition brief, the Court's analysis rests only upon those categories identified in the FAC. See K.D. v. White Plains Sch. Dist., 921 F. Supp. 2d 197, 209 n.8 (S.D.N.Y.2013) (stating plaintiff "cannot amend [his] complaint by asserting new facts or theories for the first time in opposition to [a] motion to dismiss").

In Opposition, Plaintiff argues courts in this Circuit have found measures such as "confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential [. . . ] and frequently reminding employees of the need to maintain confidentiality" adequate to protect trade secrets. (Opp'n at 9 (citing Inv. Sci., LLC v. Oath Holdings Inc., No. 20-CV-8159, 2021 WL 3541152, at *3 (S.D.N.Y. Aug. 11, 2021)); see also Syntel Sterling Best Shores Mauritius Ltd. v. Trizetto Grp., Inc., No. 15-CV-0211, 2016 WL 5338550, at *6 (S.D.N.Y. Sept. 23, 2016) ("Defendants have alleged that they have taken reasonable measures to keep the information secret by making those who use it subject to confidentiality provisions and limitations, and only making it accessible through strictly controlled servers").

Here, the FAC's secrecy allegations are consistent with those routinely upheld by district courts in this Circuit. The FAC identifies protective measures such as: limiting internal access to datasets based upon employee seniority and business necessity; requiring external parties to enter confidentiality and nondisclosure agreements; monitoring use for potential misconduct; restricting customers' access to internal systems; and providing third parties only "summarized outputs" of data subject to contractual prohibitions on reverse engineering. (FAC ¶¶ 39-48.)

These identified measures are consistent with the protections required to sustain a trade secret.

Moreover, the primary secrecy cases Defendants rely upon are distinguishable. The Turret Labs court concluded a plaintiff failed to take reasonable secrecy measures because it had "delegated total control over the sharing of" a computer program to a third party without imposing confidentiality restrictions. 2021 WL 535217, at *5. And the Sapir court rejected a plaintiff's trade-secret assertion over clearly non-secret subject matter, such as "operating agreements, limited partnership agreements, joint venture agreements, [and] membership purchase agreements", which necessarily involved third-party review. 2021 WL 4482277, at *5. Here, by contrast, the FAC identifies a variety of internal and external restrictions on the use and dissemination of its information.

Music's argument that Plaintiff's secrecy measures were inadequate because he was given restricted access to some BRM-related platforms is likewise unavailing. (See Music Reply at 11.) The FAC alleges Music's access to BRM was restricted, subject to an NDA and potential monitoring, and given "solely to facilitate internal communication needed for Music to perform his job functions during his employment." (FAC ¶¶ 44, 67-68.) That Music may have had access to certain BRM information subject to an NDA

does not, without more, establish Plaintiff failed to take reasonable measures to protect the BRM information. Whether those measures were adequately implemented or observed in practice may be addressed in discovery.

c. **Whether the Trade Secrets Were Misappropriated**

Defendants contend the FAC does not plausibly allege they acquired or used trade secrets through "improper means." (Singh Motion at 8-9; Music Motion at 13-15.) The Singh Defendants argue the FAC's supposed failure to identify whether Singh (i) "directly used Music's Modaramo credentials to access BRM data" or (ii) merely induced Music to obtain the BRM data on his behalf amounts to "an explicit admission by Plaintiff that it does not know what actually occurred." (Singh Motion at 8 (quoting FAC ¶ 93).) Further, the Singh Defendants contend the FAC fails to identify: any specific trade secret Singh acquired, used, or accessed; how and when Singh received any specific trade secret; or how any specific trade secret was incorporated into Gumball. (Id. at 9–10.) Music similarly argues no "improper use" occurred because he was authorized to access Plaintiff's systems and did not disclose the trade-secret information, and because Plaintiff's investigation of his laptop revealed only circumstantial evidence of misappropriation. (Music Motion at 11; Music Reply at 5.)

Plaintiff contends its allegations are adequate under Southern District authorities such as AUA Private Equity Partners, LLC v. Soto, where a court found a plausible misappropriation claim where a defendant allegedly transmitted trade secrets from her work laptop to personal cloud-based storage, and Medidata Solutions, Incorporated v. Veeva Systems Incorporated, where defendants allegedly retained the plaintiff's trade secrets and documents marked "private and confidential" for use to create competing products. (Opp'n at 11 (citing Soto, 2018 WL 1684339, at *7 (S.D.N.Y. Apr. 5, 2018); Medidata, No. 17-CV-0589, 2018 WL 6173349, at *4 (S.D.N.Y. Nov. 26, 2018)).)

The FAC's series of allegations—which the Court must accept as true at this stage—plausibly support an inference of misappropriation through improper means. In particular, the FAC alleges: Singh either directly or indirectly exploited Music's credentials to obtain BRM data; Music's credentials were "used to perform approximately 170 unauthorized activities" and access granular BRM materials for which he had no legitimate need; Music invited Singh to a client meeting without authorization; and Gumball now possesses many of the same technologies Plaintiff spent years developing. (FAC ¶¶ 75, 92-93; 104-06.) These facts are further supported by allegations that many of Music's logins originated from a Singh-affiliated IP address and location. (Id.

¶ 91.) Viewed together, these circumstances plausibly support misappropriation through improper means.[13]

Music's argument that his use of valid credentials precludes a misappropriation finding is similarly unavailing. (Music Motion at 11.) As other courts in this District have recognized, authorization to access a system does not authorize an employee to use or disclose trade-secret information for purposes contrary to the interests of the trade-secret owner. See Kraus USA, 2020 WL 2415670, at *7 (allegations defendant "downloaded sensitive information that he was prohibited from sharing mere days before his resignation" using valid login credentials were "sufficient to sustain a claim under the DTSA").[14]

---

[13] In Reply, Music argues the FAC impermissibly pleads misappropriation through "group pleading" and "fails to inform each defendant of its specific role." (Music Reply at 13–14 (citing United States ex rel. v. United Healthcare Ins. Co., 848 F.3d 1161, 1184–85 (9th Cir. 2016)).) As the allegations summarized above indicate, however, the FAC adequately distinguishes the alleged roles of the Singh Defendants and Music.

[14] In Reply, Music cites to a portion of KCG Holdings, Inc. v. Khandekar for the proposition that the FAC's allegations of "improper means" under the DTSA are insufficient. (Reply at 12 (citing No. 17-CV-3533, 2020 WL 1189302, at *15 (S.D.N.Y. Mar. 12, 2020)).) The cited portion of KCG Holdings addresses the CFAA, which is irrelevant to the DTSA. Id. Drawing further distance between KCG Holdings and the assertion it purportedly supports is a separate portion of the opinion, which does address a DTSA claim, and concludes the plaintiff plausibly stated a misappropriation claim. Id. at *13.

Because Plaintiff has plausibly alleged protectable subject matter, adequate secrecy measures, and Defendants' misappropriation, Defendants' Motions are DENIED as to the DTSA Claim.

2. **The State Law Misappropriation Claim**

"New York law recognizes the cause of action for misappropriation of confidential information only to the extent that the allegedly 'confidential information' qualifies for trade secret protection." Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d 328, 394 (S.D.N.Y. 2023) (further citation omitted). Additionally:

> To state a claim for misappropriation of trade secrets under New York law, the Complaint must plausibly allege "(1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means."

ExpertConnect, L.L.C. v. Fowler, No. 18-CV-4828, 2019 WL 3004161, at *6 (S.D.N.Y. July 10, 2019) (quoting Schroeder v. Pinterest Inc., 17 N.Y.S.3d 678, 690 (N.Y. App. Div. 1st Dep't 2015)). As "[t]he requirements are similar for showing a misappropriation of a trade secret under the DTSA and misappropriation under New York common law", because the Court has found Plaintiff adequately alleged its DTSA Claim, Plaintiff has also adequately alleged its State Law Misappropriation Claim. ExpertConnect, 2019 WL 3004161,

at *7.[15] Accordingly, Defendants' Motions are DENIED as to the State Law Misappropriation Claim.

### 3. **Singh Breach of Contract Claim**

"To state a claim for breach of contract under New York law, a plaintiff must adequately allege each of the following elements: '(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages.'" Comfort Inn Oceanside v. Hertz Corp., No. 11-CV-1534, 2011 WL 5238658, at *3 (E.D.N.Y. Nov. 1, 2011) (quoting Harsco Corp. v. Segui, 91 F.3d 337, 348 (2d Cir. 1996)). "[T]o state a cause of action to recover damages for a breach of contract, the plaintiff's allegations must identify the provisions of the contract that were breached." Barker v. Time Warner Cable, Inc., 83 A.D.3d 750, 751 (N.Y. App. Div. 2d Dep't 2011).

Plaintiff alleges Singh breached the Singh Offer Letter and NDA by failing to "maintain the confidentiality of all

---

[15] Defendants argue, if the Court grants their Motions as to the federal claims, it should decline to exercise supplemental jurisdiction over Plaintiff's state-law claims. (Singh Motion at 1; Music Motion at 5–6.) Because many of Plaintiff's state-law claims arise from the same facts as the federal claims, the Court DENIES the Motions to the extent they request the Court decline to exercise supplemental jurisdiction. See Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 121–22 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(a)).

Modaramo's confidential information and trade secrets; refrain from competing with Modaramo both during his employment and for one year after his employment; and refrain from soliciting Modaramo's clients, customers, or employees for a one-year period after his employment." (FAC ¶ 130.) The FAC quotes provisions of: (a) Singh's Offer Letter, which bar him from disclosing Plaintiff's proprietary or confidential information without its consent during or after his employment; and (b) Singh's NDA, which prohibit him from disclosing Plaintiff's "Trade Secrets" without a temporal limitation and its "Confidential Information" for five years after termination of his employment. (Id. ¶¶ 56-57.) Although Plaintiff does not quote any provision of the Singh Offer Letter or NDA that expressly provides for a one-year non-compete or non-solicitation period, it alleges that Singh "co-founded and operated Gumball within the one-year post-employment periods referenced under Paragraphs 8(b), 8(c), and 8(e) of the Singh Offer Letter and Paragraphs 1 and 5 of the Singh NDA." (Id. ¶ 77.)

Singh's primary argument against the Singh Breach of Contract Claim focuses on the FAC's failure to quote a non-competition or non-solicitation agreement, while offering little pushback on the alleged disclosure-related breaches. (Singh Motion at 11-12.) Although it perhaps would have been better if the FAC quoted from the alleged non-compete and non-solicitation

provisions in the Singh Offer Letter and NDA, it nonetheless satisfies Plaintiff's obligation to "identify the provisions of the contract that were breached," Barker, 83 A.D.3d at 751," which at the pleading stage, is all that is required. Additionally, as Singh is alleged to have founded Gumball "[i]n or about January 2024," Plaintiff has plausibly alleged breaches of the non-competition and non-solicitation provisions took place within the one-year period following his March 2023 termination. (See Id. ¶¶ 72-76.)

Plaintiff's allegations as to the disclosure-related breaches are far clearer, as the FAC identifies and quotes to the Singh Offer Letter and NDA provisions concerning his "Trade Secret and Confidential Information" obligations, which remain in effect. (See FAC ¶¶ 56-57.) As Plaintiff has plausibly stated its DTSA and State Law Misappropriation claims, it has also plausibly alleged such conduct amounts to a breach of the obligations contained in the Singh Offer Letter and NDA.

In a last-ditch effort to avoid liability, Singh asserts that, even if the contracts are valid, the FAC's damages allegations are too generalized and fail to tie a specific contractual breach to a distinct injury. (Singh Motion at 12.) In support, Singh relies upon Leary v. Wafra, where a Southern District court concluded generalized allegations of "lost profits,

lost business opportunities, and reputational harm" were insufficient to establish breach-related damages. (Id. (citing No. 18-CV-0048, 2019 WL 4805849, at *6 (S.D.N.Y. Sept. 30, 2019)).)

However, the allegations here are materially different from those in Leary. There, the employee allegedly used his work email to send confidential information to his personal email account, but did not use the "confidential information in any way that adversely affected" the claimant. Id. at *5–6. Here, by contrast, Singh allegedly coordinated with Music to obtain Plaintiff's trade secrets and confidential information for use in a direct competitor. In other words, while the Leary defendant was accused of taking trade secrets and not using them against the claimant, Singh is accused of taking and using trade secrets in a competing business. This suffices to show damages at the motion to dismiss stage. Accordingly, Singh's Motion to dismiss the Breach of Contract Claim is DENIED.

4. **Music Breach of Contract Claim**

The Music Breach of Contract Claim alleges Music's coordination with Singh breaches the confidentiality obligations in the Music Offer Letter and NDA, which are identical to the confidentiality obligations contained in the Singh Offer Letter and NDA. (See FAC ¶¶ 56-57, 64-65, 135–147.) It further alleges Music's supposed work for TaxMagnet and diversion of Everflow

payments run afoul of his contractual obligation to "devote his full time and attention to his Modaramo duties." (Id. ¶¶ 137, 143-44.) For the same reasons Plaintiff plausibly stated the Singh Breach of Contract Claim related to the confidentiality provisions of the Singh Offer Letter and NDA, here, too, it has plausibly stated the Music Breach of Contract Claim related to the confidentiality provisions of the Music Offer Letter and NDA, as Music's alleged coordination with Singh would run afoul of these provisions.

Conversely, for the claims related to the TaxMagnet and Everflow conduct, which Plaintiff contends violated Music's "contractual obligation to devote his full time and attention to his Modaramo duties", the FAC is devoid of details that could sustain a plausible claim related to these alleged activities. (FAC ¶ 142.) For example, the FAC does not explain what role Music played in TaxMagnet, what "company resources" he used in connection with his work for TaxMagnet, or what TaxMagnet's business activities entailed. (FAC ¶¶ 99, 144, 157.) Similarly, the FAC's allegations concerning the Everflow payments are accompanied by bare allegations that the payments "belonged to Modaramo" and that Modaramo "had an interest" in them, without any supporting facts identifying a policy, contractual provision, or course of dealing supporting its right to income or Music's improper taking of it. (Id. ¶¶ 97-98, 145.) Without more, the Court cannot draw a

reasonable inference that Music is liable for this portion of the Music Breach of Contract Claim.

Accordingly, Music's Motion is DENIED to the extent it seeks dismissal of claims based upon the confidentiality and non-disclosure provisions of the Music Offer Letter and NDA, and GRANTED to the extent it seeks dismissal of claims based upon the TaxMagnet activities and Everflow payments.

5. **The Conversion Claim**

"Conversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property that interferes with and is in defiance of a superior possessory right of another in the property." Command Cinema Corp. v. VCA Labs, Inc., 464 F. Supp. 2d 191, 199 (S.D.N.Y. 2006) (quoting Schwartz v. Capital Liquidators, Inc., 984 F.2d 53, 53 (2d Cir. 1993)). A conversion claim, however, may be "dismissed as a mere duplication of the contract cause of action" where it is based on "the same facts upon which [P]laintiffs pleaded their breach of contract claim." AD Rendon Comm'cns, Inc. v. Lunina Americas, No. 04-CV-8832, 2007 WL 2962591, at *4-5 (S.D.N.Y. Oct. 10, 2007) (dismissing conversion claim based on unauthorized bank transfers that were also subject of a breach of contract claim); Nwagboli v. Teamwork Transp. Corp., No. 08-CV-4562, 2009 WL 4797777, at *9 (S.D.N.Y. Dec. 7, 2009) (dismissing conversion claim where

"plaintiffs allege conversion because the defendants breached the shipment contract and have refused to return, to the plaintiffs, their cars and the fees paid" and "[t]hese are the same facts upon which the plaintiffs pleaded their breach of contract claim").

Plaintiff's Conversion Claims against Singh and Music are both primarily based on unauthorized use of Plaintiff's trade secrets and confidential information through improper means and, as to Music, on the alleged diversion of Everflow payments. (Compare FAC ¶¶ 128-147 with FAC ¶¶ 148-154.) Because those claims are based on "the same facts upon which the plaintiffs pleaded their breach of contract claim", Plaintiff may not maintain a duplicative Conversion Claim against Singh or Music. Nwagboli, No. 08-CV-4562, 2009 WL 4797777, at *9.

However, although no party addressed this point in their briefs, the Conversion Claim is not duplicative as to Gumball, which is not subject to a contract with Plaintiff. As discussed above, Plaintiff has plausibly alleged Gumball used Plaintiff's misappropriated trade secrets and confidential information and, in doing so, exercised unauthorized dominion or control over Plaintiff's property. See Command Cinema Corp., 464 F. Supp. 2d at 199. This is sufficient to withstand a Rule 12(b)(6) challenge. Accordingly, the Motions to dismiss the Conversion Claim are GRANTED as to Singh and Music, but DENIED as to Gumball.

B. **The CFAA Claim**

The CFAA prohibits users from "intentionally access[ing] a computer without authorization or exceed[ing] authorized access" to obtain "information from any protected computer." 18 U.S.C. § 1030(a)(2). To state a CFAA claim, a plaintiff must plausibly identify at least $5,000 in losses stemming from "responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11); see also Turret Labs, 2021 WL 535217, at *6 (the CFAA "reaches only those losses emanating more directly from the computer intrusion itself: the cost of investigating the intrusion and patching and repairing the system"). The Singh Defendants argue the CFAA Claim fails because: (1) Singh's alleged access was not "without authorization" under the Supreme Court's framework in United States v. Van Buren, since Music's Modaramo credentials were valid, and (2) Plaintiff has not plausibly pleaded at least $5,000 in losses. (Singh Motion at 9-10 (citing 593 U.S. 374, 376 (2021).) For the reasons addressed below, both arguments fail.

1. **Whether Singh's Access Was "Authorized"**

The Singh Defendants' "authorized use" argument is premised upon their interpretation of the Supreme Court's decision

in United States v. Van Buren, in which the Supreme Court reversed a police sergeant's criminal CFAA conviction for improperly obtaining information from a law-enforcement database in exchange for money. 593 U.S. at 378. The Court reasoned that, because the sheriff was permitted to access the database for legitimate reasons, his access was "authorized" for CFAA purposes under the statute's "gates-up-or-down approach" even though he accessed the information for an illegitimate purpose unrelated to work. Id. at 390. In United States v. Valle, another case cited by the Singh Defendants, the Second Circuit similarly held that a police officer's improper use of a police database did not constitute "unauthorized" use under the CFAA. 807 F.3d 508, 523 (2d Cir. 2015). Because Music held valid credentials, the Singh Defendants argue Singh's alleged use of those credentials was "authorized." (Singh Motion at 9.)

By contrast, Plaintiff contends the relevant inquiry is whether the person using the credentials was authorized to do so, and not just whether the credentials were valid. (Opp'n at 11-12.) In support, Plaintiff cites Zap Cellular, Incorporated v. Weintraub, in which a former employee allegedly accessed his former employer's computers using valid credentials after his employment had ended. (Opp'n at 12 (citing No. 15-CV-6723, 2022 WL 4325746, at *6 (E.D.N.Y. Sept. 19, 2022)).) Although his credentials remained valid, the Zap Cellular court rejected the former

employee's "authorized use" argument on the ground that, unlike the law enforcement officers in Van Buren and Valle, he was an outsider to the organization and, thus, more akin to that of a "so-called outside hacker[ ] . . . who access[es] a computer without any permission at all." Id. (quoting Van Buren, 593 U.S. at 389).

The Court finds the Zap Cellular rationale compelling and applicable. The Singh Defendants are outsiders to Plaintiff's organization and, according to the FAC, were not authorized to use Music's credentials or direct Music to use those credentials on their behalf. Moreover, Van Buren based its "gates-up-or-down" approach on a "computer-context understanding of access as entry", which requires consideration of whether a user "can or cannot access a computer system." 593 U.S. at 390. Thus, the relevant inquiry is whether the person using credentials is authorized to do so, not whether valid credentials were used by someone other than the credential holder. Therefore, the FAC plausibly supports the Singh Defendants' "unauthorized use" for CFAA purposes.[16]

---

[16] Singh argues "[t]he FAC alleges that Singh accessed Modaramo's systems using Music's credentials but again pleads no facts establishing unauthorized access by Singh himself." (Singh Motion at 9.) In support, Singh cites no additional authority, but instead relies upon factual contentions made in the Singh Affidavit, which the Court may not consider at this stage. (Id.) Nevertheless, the FAC alleges sufficient facts to support unauthorized access from Singh, including coordination between Singh and Music to misappropriate Plaintiff's trade secrets, Singh's training in BRM

2. **Whether Plaintiff Alleged Sufficient Losses**

A CFAA Claim requires the plaintiff to allege at least $5,000 in "damage" or "loss" stemming from "unauthorized use." 18 U.S.C. § 1030 (g). The FAC alleges Plaintiff has suffered losses "far exceeding $5,000" as a result of the Singh Defendants' conduct, including costs associated with "forensic analysis, damage assessment, and restoration of security protocols." (FAC ¶ 126.) In arguing these allegations are insufficient, the Singh Defendants rely upon Turret Labs, which deemed conclusory an allegation of losses "well in excess of $5,000" unsupported by any specifics concerning the nature of the loss. Turret Labs, 2021 WL 535217, at *7 (citing Fink v. Time Warner Cable, No. 08-CV-9628, 2009 WL 2207920, at *4 (S.D.N.Y. July 23, 2009) (dismissing CFAA loss allegation that "merely parrot[ed] the statutory language and [was] thus insufficiently factual")).

In this instance, the FAC does not "merely parrot statutory language." Rather, it ties Plaintiff's alleged losses to specific cost-incurring activities, including forensic analyses and damage assessments. (See FAC ¶ 126.) Such clear allegations of loss were absent in Turret Labs and Fink. Accepting Plaintiff's well-pleaded factual allegations as true, the FAC plausibly pleads

---

analytics, and IP-address and Chrome-profile evidence plausibly connecting Singh to the alleged access. (See FAC ¶¶ 79, 81-83, 95.) At the motion to dismiss stage, these allegations suffice. (See FAC ¶¶ 79, 81-83, 95.)

at least $5,000 in qualifying losses. Thus, the Singh Defendants' Motion is DENIED as to the CFAA Claim.

C. **The Faithless Servant Claim**

Plaintiff alleges Music breached his fiduciary duties of "loyalty, honesty, fidelity, and utmost good faith" during his employment by (1) assisting Singh in obtaining Plaintiff's trade secrets and confidential information; (2) diverting the Everflow payments into his personal account, and (3) operating TaxMagnet on Plaintiff's time and resources. (FAC ¶¶ 155-59.) Plaintiff seeks disgorgement of all compensation paid to Music during the "period of disloyalty", which the FAC does not formally define. (Id. ¶ 159.) In seeking dismissal, Music argues the FAC does not state a faithless servant claim because the alleged disloyal acts did not sufficiently permeate his employment and because, as he was not in charge of Gumball, he did not benefit from the alleged disloyal conduct. (Music Motion at 19-21.)

"New York courts are far from clear regarding the contours of—and interplay between—a claim for breach of fiduciary duty and the faithless servant doctrine", as some courts treat the two doctrines as distinct while others treat them interchangeably. Yukos Cap. S.A.R.L. v. Feldman, 977 F.3d 216, 242 (2d Cir. 2020) (collecting cases). A breach of fiduciary duty requires "(1) the existence of a fiduciary duty; (2) a knowing breach of that duty;

and (3) resulting damages." Alliant Ins. Servs., Inc. v. Resilience Ins. Advisory Corp., No. 23-CV-9277, 2025 WL 2780856, at *9 (S.D.N.Y. Sept. 30, 2025) (citing Johnson v. Nextel Commc'ns, Inc., 660 F.3d 131, 138 (2d Cir. 2011)). Because a faithless servant "is generally disentitled to recover her compensation", courts "in the Circuit have limited the faithless servant doctrine 'to cases where the employee, acting as the agent of the employer, unfairly competes with his employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks.'" Id. (quoting LifeSci Cap. LLC v. Revelation Biosciences, Inc., No. 22-CV-1411, 2024 WL 3634709, at *2 (S.D.N.Y. Aug. 1, 2024)).

Although New York courts have "yet to determine the precise extent of an employee's disloyalty that is required for an employer to recover under the faithless servant doctrine", they have generally applied one of two standards to determine whether forfeiture is warranted. (Id. (quoting Yukos Capital, 977 F.3d at 236)); see also Turner v. Konwenhoven, 100 N.Y. 115, 120 (1885); Murray v. Beard, 102 N.Y. 505, 508 (1886).) Under the Turner standard, faithless servant liability attaches where an employee's "misconduct and unfaithfulness . . . substantially violates the contract of service." Yukos Capital, 977 F.3d at 236 (quoting Turner, 100 N.Y. at 120). Under the Murray standard, liability attaches where an employee "acts adversely to his employer in any

part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment." Yukos Capital, 977 F.3d at 237 (quoting Murray, 102 N.Y. at 508).

As discussed above with respect to the Music Breach of Contract Claim (see supra at pp. 33-36), the sparsely-pleaded TaxMagnet and Everflow allegations do not provide a sufficient basis for any cause of action. The Court will proceed to consider whether the FAC's remaining allegations state a Faithless Servant Claim.

Throughout the course of his employment, Music is alleged to have: coordinated with Singh to give him access to trade secrets; used his credentials "to perform approximately 170 unauthorized activities"; had access to a Chrome profile containing Singh-associated data; and invited Singh to a client meeting without authorization. (FAC ¶¶ 78–95.) These allegations, at minimum, indicate disloyalty permeated "part" of Music's transactions and, at maximum, show disloyalty from Music that "substantially violate[d]" his employment obligations. Thus, Plaintiff has plausibly stated disloyal conduct to satisfy either the Turner or Murray standards.

Music attempts to avoid this result by again relying upon Leary, where the court rejected a fiduciary-duty claim because

the claimant failed to identify how the defendant "used [its] confidential information to compete against it, to divert [its] business opportunities, or to engage in financially advantageous self-dealing." Leary, 2019 WL 4805849, at *3. Because he is not alleged to be a Gumball employee or to have personally benefitted from Gumball's alleged use of Plaintiff's information, Music contends the same result is warranted here. (Music Motion at 20-21.)

The Court does not read Leary to warrant this result. Unlike the complaint in Leary, which did not identify adverse use of confidential information, the FAC plausibly alleges Music helped furnish Plaintiff's trade secrets and confidential information to a competing business. (Compare Leary, 2019 WL 4805849, at *3 (breach of fiduciary duty claims "are devoid of any allegation that Mr. Leary used Wafra's confidential information to compete against it, to divert Wafra's business opportunities, or to engage in financially advantageous self-dealing"), with FAC ¶ 1 ("Singh and Music stole Modaramo's confidential information and trade secrets and weaponized them on behalf of Gumball".) As Music is alleged to have furnished trade secrets and confidential information to a competing business—in spite of his fiduciary obligations—whether Music has personally benefitted from Gumball's alleged appropriation of the secrets is irrelevant to the loyalty analysis. Accordingly, Music's Motion to dismiss the Faithless

Servant Claim is GRANTED to the extent it is based on the TaxMagnet and Everflow allegations and DENIED to the extent it is based on Music's alleged coordination with the Singh Defendants.

D. **The Aiding and Abetting Claim**

"A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." Lerner v. Fleet Bank, N.A., 459 F.3d 273, 294 (2d Cir. 2006) (quoting Kaufman v. Cohen, 307 A.D.2d 113, 125 (N.Y. App. Div. 1st Dep't 2003)). "Although a plaintiff is not required to allege that the aider and abettor had an intent to harm, there must be an allegation that such defendant had actual knowledge of the breach of duty." Id. (quoting Kaufman, 307 A.D.2d at 125). "A person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator." Kaufman, 307 A.D.2d at 126. "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." Id.

As the Court has already determined, Plaintiff has plausibly stated a Faithless Servant Claim against Music to the extent it is based upon his alleged coordination with the Singh

Defendants. Even so, the Singh Defendants contend Plaintiff has failed to identify (1) whether Singh had the requisite "actual knowledge" required to sustain the Aiding and Abetting Claim; or (2) that Singh took any specific action to induce or facilitate a breach. (Singh Motion at 13-14.) Specifically, Singh contends the FAC does not establish that he knew of Music's particular contractual obligations to preserve Plaintiff's trade secrets or confidential information. (Id.)

The Court disagrees. The FAC states several instances of "substantial assistance", which the Court must accept as true at this stage. See Kaufman, 307 A.D.2d at 126. Specifically, the FAC alleges: (1) Singh, a non-employee, convinced Music to use his valid credentials in a manner that benefitted the Singh Defendants at Plaintiff's expense; (2) Singh attended a client meeting despite knowing he was not authorized to do so, as inferred from Music's request that the client not disclose Singh's presence, and Defendants' subsequent efforts to direct the client away from Plaintiff; (3) Singh used Plaintiff's trade secret and confidential information obtained via Music in Gumball's business; (4) Music repeatedly accessed Plaintiff's systems from a Singh-affiliated IP address and location; and (5) a subsequent investigation of Music's laptop uncovered a Chrome profile containing Singh-associated information. (FAC ¶¶ 78-83, 95, 103-07, 117-19, 162.) At the pleading stage, these allegations

plausibly demonstrate Singh knowingly and substantially assisted Music's alleged breach. Accordingly, the Singh Defendants' Motion is DENIED as to the Aiding and Abetting Claim.

E. **Tortious Interference With Contract Claim**

"Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom." Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996).

Plaintiff's Tortious Interference with Contract Claim is based upon the Singh Defendants' alleged interference with the Music Offer Letter and NDA. (See FAC ¶¶ 165-71.) Despite this, much of the Singh Defendants' Motion focuses on the FAC's purported failure to identify details about the contract between Plaintiff and the Unidentified Client. (Singh Motion at 14.) These arguments do not bear on whether the Singh Defendants tortiously interfered with Music's Offer Letter and NDA, which the FAC quotes at length. The FAC also alleges Singh convinced Music to engage in breaching behavior, such as using his Modaramo credentials for Gumball's benefit. (See, e.g., FAC ¶ 162.) Hence, the FAC plausibly alleges the Tortious Interference with Contract Claim, which the Singh

Defendants are unable to counter and show dismissal is warranted; therefore, the Singh Defendants' Motion is DENIED as to the Tortious Interference with Contract Claim.

F. **Tortious Interference with Clients Claim**

To state a tortious interference with prospective economic advantage claim under New York law, a plaintiff must: "state that '(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship.'" Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006) (quoting Carvel Corp. v. Noonan, 350 F.3d 6, 17 (2d Cir. 2003)). "Where there has been no breach of an existing contract, but only interference with prospective contract rights, however, plaintiff must show more culpable conduct on the part of the defendant." Carvel Corp., 3 N.Y.3d at 190 (quoting NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614, 621 (1996)). Moreover, "[a] properly pleaded complaint for this tort must allege relationships with specific third parties with which the respondent interfered." Muddy Bites, Inc. v. Evergreen USA LLC, No. 24-CV-7089, 2025 WL 2662959, at *6 (S.D.N.Y. Sept. 17, 2025) (quoting AIM Int'l Trading, L.L.C. v. Valcucine S.p.A., No. 02-CV-1363, 2003 WL 21203503, at *6 (S.D.N.Y. May 22, 2003)).

The Singh Defendants persuasively argue the Tortious Interference with Clients Claim is too vague to survive dismissal. (Singh Motion at 15.) As the Singh Defendants observe, the FAC fails to identify who the numerous "third-party clients" were, the nature of the plainly-stated "ongoing business relations", or whether Plaintiff even had contracts with them. (FAC ¶ 173.) Indeed, the FAC does not identify a single client by name, which runs afoul of Plaintiff's obligation to "allege relationships with specific third parties with which the respondent interfered." Muddy Bites, 2025 WL 2662959, at *6. Without this information, Plaintiff has not stated a plausible claim; thus, Plaintiff's claim cannot be sustained. Accordingly, the Singh Defendants' Motion is GRANTED as to the Tortious Interference with Clients Claim.

G. **Usurpation Claim**

"To plead a claim for usurpation of a corporate or joint venture opportunity, a plaintiff must allege that (1) defendants were plaintiff's fiduciaries, and (2) defendants 'divert[ed] and exploit[ed] for their own benefit any opportunity that should be deemed an asset of the corporation' or joint venture." Vogel v. TakeOne Network Corp., No. 22-CV-3991, 2023 WL 5276857, at *6 (S.D.N.Y. Aug. 16, 2023) (quoting Altman Stage Lighting, Inc. v. Smith, No. 20-CV-2575, 2022 WL 374590, at *8 (S.D.N.Y. Feb. 8, 2022)). Plaintiff asserts its Usurpation Claim against Music based on his supposed diversion of the Everflow referral payments. (FAC

¶¶ 188–94.) As discussed above, however, the Everflow allegations lack the necessary factual detail to serve as the basis of any claim.[17] Accordingly, Music's Motion is GRANTED as to the Usurpation Claim.

H. **Unjust Enrichment Claim**

"To establish unjust enrichment, the plaintiff must show '(1) the other party was enriched, (2) at the other party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered.'" Hesse v. Godiva Chocolatier, Inc., 463 F. Supp. 3d 453, 473 (S.D.N.Y. 2020) (quoting Buonasera v. Honest Co., Inc., 208 F. Supp. 3d 555, 567 (S.D.N.Y. 2016)). Unjust enrichment "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff" and "is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 779 (2012). Although "a claim for unjust enrichment may be pleaded in the alternative to other claims", "[i]f a 'valid and enforceable'

[17] In its Opposition, Plaintiff cites purported Everflow-related admissions in Music's Affidavit. (Opp'n at 17 (citing Music Aff. ¶¶ 56–60).) Because Defendants may not rely upon their affidavits to support dismissal, Plaintiff likewise may not rely upon those affidavits to oppose dismissal.

contract governs the dispute, a party may not recover under unjust enrichment." Elsevier, 2018 WL 557906, at *2 (quoting Barnet v. Drawbridge Special Opportunities Fund LP, No. 14-CV-1376, 2014 WL 4393320, at *22 (S.D.N.Y. Sept. 5, 2014); Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield, 448 F.3d 573, 587 (2d Cir. 2006)).

Defendants contend the Unjust Enrichment Claim fails because: (1) a contract governs the relevant subject matter; and (2) the claim duplicates Plaintiff's other causes of action. (See Singh Motion at 15-16; Music Motion at 31-33.) In Opposition, Plaintiff argues it may plead unjust enrichment in the alternative to its Breach of Contract Claims because the parties dispute Defendants' specific contractual obligations under the respective Offer Letters and NDAs. (Opp'n at 16.) On this point, Plaintiff cites OEC Freight Incorporated v. Storlie Furniture Distributors, LLC, where a Southern District court permitted an unjust enrichment claim to proceed in the alternative to a breach of contract claim because the parties disputed whether a defendant was bound by a contract in the first place. No. 23-CV-6299, 2025 WL 1617456, at *5 (S.D.N.Y. June 6, 2025).

The Court agrees with Defendants: allowing the Unjust Enrichment Claim under these circumstances would be inconsistent with the narrow nature of the tort. Plaintiff's Unjust Enrichment

Claim reads as a "catch-all" cause of action incorporating all its generalized grievances into a single claim. (See FAC ¶¶ 195-98.) Moreover, unlike in OEC Freight, there is no independent dispute as to whether the Singh and Music Offer Letters and NDAs are binding on Singh and Music. Although no contract exists between Plaintiff and Gumball, the Unjust Enrichment Claim cannot be maintained against Gumball because it duplicates the State Law Misappropriation, Conversion, Aiding and Abetting, and Tortious Interference with Contract Claims. See Corsello, 18 N.Y.3d at 790-91 (unjust enrichment is "not available where it simply duplicates, or replaces, a conventional contract or tort claim"); see also Select Rsch. Ltd. v. Amazon.com, Inc., No. 24-CV-6419, 2025 WL 2521158, at *8 (S.D.N.Y. Sept. 2, 2025) (barring unjust enrichment where it "turns on the same facts that form the basis for its trade secret misappropriation claims"). Accordingly, the Motions are GRANTED as to the Unjust Enrichment Claim.

**CONCLUSION**

For the stated reasons, IT IS HEREBY ORDERED that the Motions are GRANTED IN PART AND DENIED IN PART to the following extent:

I. As to Singh's Motion (ECF No. 24):

A. It is GRANTED as to:

1. The Conversion Claim, only to the extent it is asserted against Singh;
2. The Tortious Interference with Clients Claim; and

3. The Unjust Enrichment Claim; and

B. It is DENIED as to:

1. The DTSA Claim;
2. The State Law Misappropriation Claim;
3. The Singh Breach of Contract Claim;
4. The Conversion Claim, only to the extent it is asserted against Gumball;
5. The CFAA Claim;
6. The Aiding and Abetting Claim; and
7. The Tortious Interference with Contract Claim.

II. As to Music's Motion (ECF No. 24-1):

A. It is GRANTED as to:

1. The Music Breach of Contract Claim, to the extent it asserts breaches related to Music's alleged TaxMagnet work or diversion of Everflow payments;

2. The Conversion Claim;

3. The Faithless Servant Claim, to the extent it is based on Music's alleged TaxMagnet work or diversion of Everflow payments;

4. The Usurpation Claim; and

5. The Unjust Enrichment Claim; and

B. It is DENIED as to:

1. The DTSA Claim;

2. The State Law Misappropriation Claim;

3. The Music Breach of Contract Claim, to the extent it is based on the confidentiality and non-disclosure provisions of the Music Offer Letter and NDA; and

4. The Faithless Servant Claim, to the extent it is based on Music's alleged coordination with the Singh Defendants.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated: October 7, 2026
Central Islip, New York